Filed 9/14/20  In re N.O. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re N.O., a Person Coming Under the Juvenile Court Law. | B300599 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 19CCJP04253A |
| Plaintiff and Respondent, | |
| v. | |
| T.O., | |
| Defendant and Appellant; | |
| N.O., a Minor, etc., | |
| Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, Phillip L. Soto, Judge.  Affirmed in part, dismissed in part.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant T.O.

Karen J. Dodd, under appointment by the Court of Appeal, for Appellant N.O., a Minor, etc.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Tracey F. Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

Father and his son N.O. separately appeal from the juvenile court's September 5, 2019 jurisdictional finding that father failed to protect N.O. and dispositional order removing N.O. from father's custody. The juvenile court declared N.O. a dependent of the court under Welfare and Institutions Code section 300[1] based on both mother's and father's conduct. Mother is not a party to this appeal and the jurisdictional findings as to her are not challenged. During the pendency of this appeal, the juvenile court ordered N.O. to be returned to home of parents.

The Los Angeles County Department of Children and Family Services (Department) asks us to dismiss the appeals as moot. We conclude the appeals from the dispositional order are moot and dismiss them as to that issue. We exercise our discretion to consider the merits of the appeals on the jurisdictional finding as to father, however, and conclude substantial evidence supports that finding. We thus affirm on that ground.

---

[1] Statutory references are to the Welfare and Institutions Code.

2

## FACTS AND PROCEDURAL BACKGROUND

Because resolution of this appeal turns on the existence of substantial evidence supporting the juvenile court's jurisdictional findings, we state the facts in a light most favorable to the court's decision. (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.) As mother is not a party to this appeal, we focus on the evidence supporting the juvenile court's findings against father and discuss the facts relevant to other findings only as context requires.

**1.    *May 2019 incident***

Mother and father are the parents of N.O., born February 2015. The family came to the attention of the Department when it received information on its hotline that mother had been admitted to the hospital on May 19, 2019, for threats of suicide. According to the caller, mother had been at home, drunk, and father and mother began to argue about mother being intoxicated. Mother said no one loved her and began to bang on the walls. She grabbed a knife, threatened to kill herself, and then threw the knife. Father called 911 and mother was taken to the hospital for a psychiatric evaluation. Mother's alcohol levels were at .261, a high level.

A Department social worker first met with mother about the incident on June 4, 2019, and with father on June 21, 2019. During her initial interview, mother said she had started drinking that day when she came home from work and N.O. was at school. In a later interview in August 2019, mother explained she had worked until almost 10 p.m. that night. Maternal grandmother had been caring for N.O. and mother's minor sister while mother worked. Maternal grandmother drove N.O. and mother to their home after stopping at the liquor store for mother. Mother said she started drinking and invited her friend

Monica over. When father came home, he was upset that she was drunk. She remembered banging on the walls and arguing with father, but blacked out after that. She had been feeling sad over her own mother and minor sister's financial problems. Mother told the social worker father kept N.O. in the bedroom and told her to stay away from the child. She told the social worker father " 'always protects [N.O.] if I'm not feeling well.' "

When first interviewed, mother told the social worker she drinks once per week or every other week, usually moderately, but that sometimes she "binges." She said that when she drinks, someone sober cares for N.O. Mother also stated she smokes marijuana on her walk to or from work, but never near N.O. and only when he is not home or someone sober is caring for him.

Father separately described the May 2019 incident to a social worker. The night of the incident, he arrived home early in the morning after DJing a party and saw mother drinking alone. He was concerned because mother had been caring for N.O. alone while drinking. Father went to bed, but at 4 a.m. mother began banging on the wall and threatening suicide. Father confirmed N.O. was in the bedroom during the incident. He called law enforcement, who took mother to the hospital. Mother returned the next evening. She was embarrassed about what had happened.

Father told the social worker that mother had not been drinking a lot or alone since the incident. Things had been good at home. Father said he had no safety concerns about leaving N.O. in mother's care as mother had never threatened to hurt herself before the incident and has never threatened to harm others. Father stated he was shocked by the incident "because nothing like that had ever happened before."

4

N.O. could not provide details about the incident. He told the social worker that mother cries after she drinks. He said he was "happy at home and not scared of anyone." Later, a social worker spoke with the director of N.O.'s preschool. She said they had not seen "anything worrisome" with N.O. or his parents and have had no safety concerns.

The Department also interviewed mother's friend Monica. She said she and mother "probably overdid it that night." Monica has known mother for about 10 years. She said mother never has threatened suicide or acted out like she did that night. Monica stated she sometimes babysits N.O., and he always is happy to see mother come home. She had no safety concerns for N.O. in mother's care and considered the incident "a one-time occurrence."

In its detention report filed July 5, 2019, the Department described an earlier incident that occurred between parents in December 2016. Father came home with N.O. and found mother intoxicated. He became upset and parents got into a fight. While the child was in the bedroom, father grabbed mother, threw her to the ground, and punched and slapped her. Mother threw a glass container. Father then choked mother. He was arrested. Both parents were embarrassed and ashamed for their behavior and said it was an isolated incident. N.O. did not witness the fight.

In its report, the Department noted mother's mental health issues appeared to be exacerbated by her consumption of alcohol, and mother had disclosed binge drinking regularly. Although N.O. was in the bedroom asleep that night in May 2019, the Department was concerned a dangerous incident could occur in the future if mother did not stabilize her mental health.

5

The Department described N.O. as appearing well-cared for and bonded to mother and father. It noted all those interviewed described the May 2019 event as a "one-time occurrence." The Department stated father was "protective" when he called law enforcement. Although the Department believed the family would benefit from court-ordered services and monitoring, it did not believe N.O. needed to be removed from parents for his safety and doing so would cause him undue trauma.

## 2. *Initial section 300 petition and detention hearing*

On July 5, 2019, the Department filed a dependency petition on behalf of N.O. under section 300, subdivision (b)(1). The first count of the petition alleged mother's mental and emotional problems and associated behaviors placed N.O. at risk of serious physical harm. Count two alleged mother's substance abuse and father's failure to protect N.O. placed N.O. at risk of serious physical harm. The court held an arraignment and detention hearing on July 8, 2019. The court directly addressed parents:

> "Mom, obviously, alcohol needs to be entirely out, drugs and alcohol, if you want to keep the child. [¶] Dad, if I were you, I would go through every cabinet, drawer, anywhere that any kind of alcohol could be stored or stashed in and find it and get it out. And the same thing for any kind of drugs you find in the house. *You are going to have to be diligent and vigilant.* I know what I'm going to say next is not going to be easy to hear, but you will have to understand the realities of the situation. If mom goes off like this again the way she

6

was described in these papers, and you don't do something to get her out of the house or get the child out of the way, they are going to be coming back to me and saying, 'See, neither one of these two can protect this young child, and you need to pull the child and put the child in foster care.' " (Italics added.)

The court told father to call "911 right away . . . and get the child out of the way" if mother had another episode.

The juvenile court ordered N.O. released to his parents under the Department's supervision with the Department to make unannounced home visits.

### 3. *July 2019 incident and N.O.'s detention*

On August 1, 2019, the Department's investigating social worker made a scheduled visit to the family home. The Department noted mother interacted with N.O. in an appropriate and caring manner, and N.O. was comfortable with mother. During the visit, the social worker observed a half bottle of cognac in the kitchen cabinet and empty beer bottles in the trash. The social worker asked mother about the alcohol; mother said it was old and that she had not been drinking.

The social worker reviewed the petition's allegations with mother, and mother described the May 2019 incident. Mother also discussed her mental health issues and experimentation with drugs as a teenager. She told the social worker she currently vapes marijuana. She said she had cut back on drinking alcohol. She said she now drinks one to two times a month and has a few beers or a few shots, " '[n]othing crazy.' "

7

Mother revealed that over the last weekend,[2] three of her friends had come over and they had "some beers." Mother estimated she had six to seven beers. She and her friends vaped on the balcony and then " 'started to dip' " into the bottle of cognac they had brought to the house. Mother said she had about three shots of cognac. At the time, father was at work and N.O. was at home in mother's care. She told the social worker, " 'It sounds bad, but I didn't over drink.' " She explained, " 'Alcohol is usually a weekend situation. I normally drink at home. . . . I normally take 1-3 shots and I'm good. It's not a daily situation.' "

Father came home during the interview. He did not know the social worker had planned an interview for that day. He explained he had not slept due to work and had to be up early again the next day for work. He arranged to come to the office the next day at 6 p.m. for his interview. Before father excused himself, the social worker briefly asked him about a DUI he had received in 2013.

Mother's admission that she continued to drink was reported to the Department's hotline. The next day, August 2, 2019, two other social workers met with mother to discuss those allegations. Mother said that on July 26, 2019, maternal grandmother drove her home from work with N.O. about 9:30 or 10:00 p.m. After mother put N.O. to bed, she invited her friend Monica over again, who brought two other friends with her, as well as the alcohol. In this interview, mother said she had only two to three beers and two to three shots. She said she told her friends she would not be drinking "too much" because she

---

[2]     It is unclear if the incident occurred on July 26 or July 27, 2019.

had N.O. She described the evening as a calm celebration and stated she was not drunk.

Mother said she was not aware the court ordered her not to drink at all. She would not have had the drinks if she had known and said she had not had any since. Mother described father as the "core stability in the family." The social workers told mother the Department would be asking for a removal order for N.O. based on mother's violation of the court orders and placing N.O. in danger by drinking alcohol while caring for him.

The two social workers and the investigating social worker met with father at their office that same day. Father said he was at work the night mother had friends over. He knew her friends would be coming over but was unaware mother planned to drink or had been drinking. He said mother had cut back on her alcohol consumption and things had been going well.

Mother joined father in the meeting to develop a safety plan. Father said N.O. was safe at home, and the best place for him was with both his parents. He "eventually" came up with a plan for caring for N.O. without mother's help. The Department described father as having a "difficult time understanding" its concerns, which it had to explain to him "several times." Mother agreed to leave the home and to have only telephonic contact with N.O. Father's friend agreed by telephone to watch N.O. at father's home when father works. The plan was "set to be valid until" August 7, 2019.

N.O. told a social worker he had not seen mother drink alcohol and was not aware of any issue the evening mother's friends were over. He felt safe at home. Maternal grandmother spoke to the social worker over the phone. She said she picks up N.O. from school and takes him to her home when mother works.

Mother, in turn, watches her minor sibling when maternal grandmother is at work. Maternal grandmother had no concerns about domestic violence between parents or about substance abuse. She also had no safety concerns about N.O. in the care of his parents. She described N.O. as a happy and active boy.

The Department detained N.O. on August 5, 2019, after obtaining an expedited removal order. The Department executed the removal order at N.O.'s preschool and placed him with his maternal great aunt. N.O. was upset. The Department informed each parent of the removal by telephone. Mother said the removal would cause N.O. trauma. She stated she would rather leave the home and keep N.O. at home with father. Father also was upset. He did not understand why the Department had taken N.O. from his custody when he had done nothing wrong and was protective of N.O. He did not understand the Department's concerns. He thought placing N.O. with mother's relatives, who are "practically strangers," put N.O. at greater risk.

The Department described father as "appear[ing] to minimize mother's drinking issues" and failing to have "insight" into the Department's concerns. The Department noted father did not seem to recognize mother has an issue with alcohol and continued to leave N.O. in her sole care. The social worker also had not been able to verify if other appropriate adults were involved in ensuring N.O.'s safety. The Department was concerned a dangerous incident could occur in the future if mother did not stabilize her mental health and father did not protect N.O. It recommended that N.O. continue to be detained from parents for his safety.

On August 8, 2019, the juvenile court granted the Department's section 385 petition to change the court's earlier home of parent order. The court ordered N.O. detained from parents. It also ordered the Department to meet with parents by August 21, 2019, to develop a safety plan with mother moving out of the house and father caring for N.O. The court granted the Department discretion to release N.O. to father if a plan was reached.

Father's counsel argued the Department and parents already had worked out that very arrangement. He stated he was "a bit confused as to why the need to detain from the father if it was already understood that the mother would leave the home." Father's counsel, joined by N.O.'s counsel, objected to the finding that there currently were no reasonable measures that could be taken to avoid detention. Counsel for the Department responded that the Department had not yet verified mother was out of the home, and it also needed to verify father's proposed childcare plan.

The court explained to father that once the Department verified mother was out of the house, and father was able to care for N.O. without her, "[t]hen and only then will the child be returned." The court found a prima facie case existed to detain N.O. from both parents, and granted the Department discretion to return N.O. to father "when the safety plan is implemented."

4.     ***Post-detention information and jurisdiction/ disposition hearing***

In its jurisdiction/disposition report filed August 21, 2019, the Department summarized its assessment of father as follows, "Father does not appear to have insight into mother's substance abuse and mental health issues. Father has a tremendous work

11

schedule and reports having two full-time jobs and appears to be gone from the home much of the day. Mother appears to have been [N.O.'s] primary caregiver while father was at work. Father appears to have minimal knowledge of what occurs when he is not present in the home. Father does not coordinate an appropriate childcare plan during his working hours, and allows mother to care for the child while under the influence." The Department noted it had been unable to meet with father due to his work schedule. Father also had tested positive for marijuana.

The Department held a child and family team meeting with parents on August 15, 2019. Parents said they had not visited N.O. since he was detained. Father could not visit over the upcoming weekend because he was traveling for work.

In its last minute information report filed September 4, 2019, the Department noted father missed scheduled meetings with the Department on August 20 and 21, 2019, because he had to work and could not make it to the office until after it had closed. He was able to attend a meeting with the Department on August 23, 2019, however, and also spoke with a social worker by telephone on August 26, 2019.

Father informed the Department that he had enrolled in parenting class and individual therapy and continued to drug test. He said he had not smoked marijuana in 30 days and only uses it to sleep.[3] Father was able to visit with N.O. for the first time on August 19, 2019. N.O. cried and asked when he could come home. The Department noted father had been in regular contact with N.O. since the August 15 team meeting.

---

[3] At the September 5, 2019 hearing, father's counsel noted it takes "about 60 days for marijuana to leave the system completely."

Father stated paternal great-grandparents were able to provide childcare if N.O. were released to father.  The Department re-placed N.O. with them on August 29, 2019.

The combined jurisdiction/disposition hearing was held on September 5, 2019.  That same day, the Department filed an amended section 300 petition.  Count b-2 of the amended petition, which pertains to father, alleges "mother . . . has a history of substance abuse and is a recent abuser of marijuana and alcohol. On 05/19/2019, the mother was under the influence of alcohol while the child was in her care and supervision.  (The child's father . . . knew of mother's substance abuse and failed to protect the child.)  Such conduct by mother (and father's failure to protect) places the child at risk of harm."

The court received the Department's reports in evidence. Mother pleaded no contest to the amended petition, but both father's and N.O.'s counsel argued the court should strike the failure to protect allegation against father.  Father's counsel argued father had protected N.O. by immediately calling law enforcement when mother had her episode in May 2019.

N.O.'s counsel joined father's counsel.  She added there was no order given at the July 8, 2019 detention hearing that mother must not be left alone with N.O.  She argued mother had not planned to drink that night in July and, when she did, father and the Department realized mother could not be N.O.'s sole caregiver.

In response, among other things, the Department's counsel contended parents were "given strict admonition . . . that the child was not to be left alone with the mother and that the mother was not to drink."  The juvenile court also stated, "[Father] was given a direct order by me not to leave the mother

13

alone with the child." Both father's and the child's counsel disputed that such an order had been given. They noted it is not in the court's July 8, 2019 minute order. N.O.'s attorney also represented she did not have a record of the order in her notes from the hearing.

Father's counsel argued father had done everything "he was supposed to do." He enrolled in counseling and in parenting classes, had made a safety plan before N.O. was detained, and had been visiting N.O. at paternal great-grandparents' home.

N.O.'s counsel added that father already had proposed paternal great-grandparents as his childcare plan. She argued there were reasonable measures to prevent removal by assisting father with childcare.

The Department's counsel asked the court to consider the fact father had left N.O. alone with mother in July, despite having had to call the police to restrain her in May. The court said it was considering that, as well as "what was reasonable under the circumstances" when it released N.O. to both parents. The court chastised father's and N.O.'s counsel:

> "What can I tell you, folks? The original 300 petition was clear that the mom has drug and alcohol issues, mental health issues. That was the whole gravamen of the case. And to stand here now . . . and say, 'Well, you didn't say specifically that [father] couldn't leave her alone with the child,' or mom in the detention report saying, 'Well, the judge didn't specifically say I couldn't drink alcohol, so me and Monica and my friends can party,' I'm speechless."

14

The court continued, "[Father] knew from the time I released [N.O.] that he's obligated as the parent to do something to make sure that the mother doesn't drink anymore." Father and his counsel protested, arguing that father had gone to work to support his family and had left mother without any alcohol. Rejecting that excuse, the court engaged in the following colloquy with father:

"The Court: Dad, if you didn't get the message at the initial hearing, hear it now. You needed to make sure that mom was not going to have friends over and party. You knew she had issues. That's what was at issue from the initial 300 when I released the child to you."

"Father: She went behind my back though."

"The Court: That doesn't matter to me. That was on you. You needed to make sure that she wasn't going to do anything like that. That was on you. Willful blindness is not an excuse to negligence. To say, 'Oh, I'm at work, so I don't know what's going on.'"

"Father: That's not what I did."

"The Court: Well, that's what the argument is, 'I didn't know. I was at work.' That is not a defense. You are responsible for making sure that these things did not happen

again.  I don't see anything
in here that says that you did."

"Father:   I took all alcohol out of the house.
No alcohol.  She moved out."

The court then gave its ruling:

"You were responsible for making sure that
the mom did not get any more alcohol because
you knew it was a trigger to the mental health
issues that got us into court in the first place.
And just to say, 'I cleaned the house.  What
am I supposed to do?' [¶] Well, what you are
supposed to do is find somebody who you could
trust to be there with the mom when you left
to go to work.  That's what you needed to do.
Find somebody to watch her to make sure that
she wasn't going to party with her friends.
That's what you needed to do.  You needed
to actively work to make sure that your child
was protected before you go off to work, because
she was not to be trusted.  You already knew
that from what you had, the information you
had coming in when we had the initial hearing
in July.  You shouldn't have left her alone.
That's the bottom line.  That's my ruling.  You
should not have left her alone.  Because these
are exactly the reasons why she shouldn't be
left alone.  She calls up Monica.  She gets her
friends to party."

Both father and his counsel informed the court mother
had moved out of the home, but the court responded, "That's not

16

enough.  Because we don't have any reason to know that he's not going to let her back in.  He's already demonstrated poor judgment."

The court continued,

"I have no problem, I really don't, if the Department can demonstrate to their satisfaction that you are actually by yourself and the grandparents can be your daycare plan and the mother is not coming over, if they want to release to you, I'm fine with that.  I really am.  But I'm not going to do that now.  You are not cooperating."

Speaking to father's counsel, the court concluded,

"It's clear to this court that the Department doesn't trust your client nor do I.  When he establishes a level of trust where we believe that he will actually take care of this four-year-old, then we can implement a safety plan but not until. . . . [¶] If and when he establishes that he can and will be trustworthy and the Department implements a safety plan with him only so the mother stays away from the child, then fine. . . . [¶] The father has got to go along with the program.  He's got to establish that level of trust."

The court sustained the amended petition, declared N.O. a dependent of the juvenile court, and found there were no reasonable means to keep the child safe without removing him from parents.  Parents were awarded monitored visits and permitted to visit N.O. at the great-grandparents' home, but parents could not reside there.  Father and N.O. appealed from

the court's order, challenging the jurisdictional findings as to father and the removal of N.O. from father's care.

At the March 5, 2020 review hearing, after the filing of these appeals, the juvenile court entered an order returning N.O. to parents' custody, but maintained jurisdiction over the child. The court ordered the Department to provide parents with family maintenance services. The court set a review hearing for September 3, 2020 and ordered the Department to address termination of jurisdiction in its next report. On the Department's request, we took judicial notice of the juvenile court's March 5, 2020 minute order.

## DISCUSSION

Father and N.O. contend substantial evidence does not support the juvenile court's finding that father failed to protect N.O. They also argue the court based its finding on father's alleged violation of a nonexistent order. Father and N.O. also contend the evidence does not support the court's dispositional order removing N.O. from father's custody.

1. ***We exercise our discretion to consider the appeals from the jurisdictional finding as to father***

The juvenile court asserted jurisdiction over N.O. based on findings against both mother and father. Mother does not appeal and neither father nor N.O. challenges the jurisdictional findings as to her.

" 'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing

18

court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773; accord, *In re M.R.* (2017) 7 Cal.App.5th 886, 896 [" '[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate' "]; *In re Briana V.* (2015) 236 Cal.App.4th 297, 309 ["[W]e need not address jurisdictional findings involving one parent where there are unchallenged findings involving the other parent."].)  When no effective relief can be granted, an appeal is moot and will be dismissed.  (*In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315.)

Nevertheless, a reviewing court may exercise its discretion to reach the merits of a challenged jurisdictional finding if the finding:  (1) "serves as the basis for dispositional orders that are also challenged on appeal"; (2) "could be prejudicial to the appellant or could impact the current or any future dependency proceedings"; or (3) "could have consequences for the appellant beyond jurisdiction."  (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1150; accord, *In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.)

On May 13, 2020, we ordered father and N.O. to show cause as to why their appeals should not be dismissed as moot. They each responded by letter brief on May 22, 2020.

Father and N.O. concede that if we reverse the jurisdictional finding made against father, the juvenile court will continue to have jurisdiction based on the sustained allegations as to mother.  They contend we should exercise our discretion to review the juvenile court's failure to protect finding because it has the potential to prejudicially impact father in this ongoing dependency proceeding and any future proceeding

19

in the juvenile court or family court.  N.O. argues that if mother relapses, the failure to protect finding against father would likely prevent the court from allowing N.O. to remain with father and also could result in the court deciding not to order reunification services.  Father also contends his name now will appear on the Child Abuse Central Index (CACI) because substantiated known or suspected cases of child abuse or severe neglect must be forwarded to the Department of Justice under Penal Code section 11169.

Father's contention that his name will appear on CACI is speculative.  Nothing in the record or father's response to our order to show cause indicates the Department has reported him for listing in CACI.  (Pen. Code, § 11169, subd. (c) [reporting agency must notify known or suspected child abuser that it has reported him or her to CACI].)  N.O. and father also speculate as to how the failure to protect finding potentially could affect father adversely in future proceedings.

Nevertheless, because the failure to protect finding also is the basis of the dispositional order father and N.O. challenge, and " 'in an abundance of caution and because dismissal of the appeal operates as an affirmance of the underlying judgment or order [citations], we consider the merits of [the] appeal[s]' " from the jurisdictional finding as to father.  (*In re C.V.* (2017) 15 Cal.App.5th 566, 571.)

We conclude, however, father's and N.O.'s challenge to the September 5, 2019 removal order is not justiciable.  As we discuss below, we find the juvenile court did not err in sustaining the failure to protect allegations against father.  And, the juvenile court's March 5, 2020 order terminating the suitable placement order and ordering N.O. to be placed in the home of parents has

20

rendered the removal order moot.  Even if we were to find error regarding the dispositional order removing N.O. from father, we would not be able to fashion a remedy that would have any practical effect.  (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1490 ["An important requirement for justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status."].)  The dispositional order removing N.O. from father is no longer in effect.  We therefore will not consider father's and N.O.'s appeals on this issue.

## 2. *Standard of review and applicable law*

" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.  [Citations.]  ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]." ' " ' "  (*I.J., supra*, 56 Cal.4th at p. 773.)  Substantial evidence is " 'evidence which is reasonable, credible, and of solid value.' "  (*In re I.C.* (2018) 4 Cal.5th 869, 892.)

21

Section 300, subdivision (b)(1) authorizes dependency jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child."  To support a jurisdictional finding under this subdivision, the Department must prove "three elements by a preponderance of the evidence: (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness."  (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)

3.     ***Substantial evidence supports the failure to protect finding***

Father and N.O. first argue the evidence does not support a finding that father failed to protect N.O. during the initial May 2019 incident.  We agree.  Father kept N.O. in the bedroom and locked the door to keep mother away from the child and then called the police.  The Department itself found father was protective by calling law enforcement when mother began acting erratically.  Nor is there evidence father should have anticipated mother's behavior.  She had been sober in the six months preceding the incident, had always had a sober adult present if she drank when N.O. was home, did not tend to drink alone, and had never threatened to hurt herself or others.  The only other incident reported before May 2019 occurred back in 2016.  Mother had been drinking, but N.O. had been away with father.  As father said, he was shocked by mother's outburst.

After that incident, however, father *was* on notice that mother had serious alcohol and mental health issues that posed a safety threat to their young son.  We thus disagree with father's

22

and N.O.'s contention that substantial evidence does not support the court's finding that father failed to protect N.O. based on what occurred after the Department became involved.

Father and N.O. assert the juvenile court based its failure to protect finding on the incorrect premise that it had ordered father not to leave mother alone with N.O. The record indeed shows the court did not make that specific order during the July 8, 2019 hearing or in its minute order. Nevertheless, it certainly admonished father to be "diligent and vigilant." Its comments to father at the hearing only could have been understood to convey his need to take mother's alcohol abuse and mental health issues seriously. And, although the court stated it had directly ordered father not to leave N.O. alone with mother, we can infer that, after hearing from counsel, the court understood it had not made that specific order. The court chastised counsel for arguing father did not fail to protect N.O. in July because it " 'didn't say specifically that he couldn't leave [mother] alone with the child.' " Rather, the court reasoned father had exercised poor judgment by trusting mother would not drink; he had not done what was necessary to ensure his child's safety before leaving for work.

Having reviewed the record, substantial evidence supports the court's failure to protect finding—even in the absence of a specific order not to leave mother alone with N.O. When father described the May incident to the Department, father said, mother "drinks with friends . . . her friends enable her. . . . She craves to be socially accepted because her friends like to drink." Father argued he did not know mother planned to drink that

night in July,[4] he had taken the alcohol out of the house, and he reminded her there should be no alcohol. But, father admitted he knew mother's friends were coming over when he left N.O. alone with mother. Indeed, mother invited Monica over—the same friend who had come to the house and "overdid it" with her in May. Father knew mother's friends enabled her drinking and that mother's mental health issues were exacerbated when she drank, which—as father learned in May—could cause mother to become unstable and a threat to N.O.'s safety. Yet, father simply trusted mother would not be tempted by her friends to drink this time. He wanted to give her "the opportunity to prove herself." By doing so, father demonstrated his lack of judgment and awareness of the potential risk mother posed to N.O. in that situation, particularly given the child was only four years old.

Father said he would have asked maternal grandmother to watch N.O. if he had known mother planned to drink that night, but as the court said, "[w]illful blindness is not an excuse." Substantial evidence supports the juvenile court's implicit finding that father should not have left mother alone with N.O. knowing

---

[4]    The Department's last minute information for the court filed before the jurisdiction hearing states that at the team meeting with parents on August 15, 2019, father "was unable to understand his part in not arranging for appropriate childcare when mother expressed to father that she planned to be under the influence while caring for [N.O.]." There is no evidence that mother told father she planned to drink that night in July 2019. We are troubled by the Department's inaccurate description of events to the court. Nevertheless, as we discuss, the record supports the Department's statement in that same report that father did not understand his "role" in ensuring N.O.'s "safety in the home."

her friends were coming over.  As the court concluded, to protect N.O., father needed to do more than remove the alcohol from the house and tell mother not to drink.  He needed to be "vigilant" and take steps to ensure mother did not, in the court's words, "have friends over and party" while caring for N.O.  He did not and thus failed to protect N.O.

And, although mother had left the home after the July incident, the Department needed to see more from father before agreeing to the safety plan it had discussed with him. The Department was not yet comfortable with releasing four-year-old N.O. to father.  Moreover, at the time of the jurisdiction/disposition hearing, father continued to struggle to understand how his inaction placed N.O. at a substantial risk of harm.  Given father's lack of insight, the court reasonably could infer the risk of harm to N.O. from father's failure to protect still existed.  (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1151 [risk of harm must still exist at the time of the jurisdiction hearing for § 300, subd. (b)(1) to apply].)

## DISPOSITION

The jurisdictional finding as to father is affirmed.  The appeals as to the September 5, 2019 dispositional order are dismissed as moot.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:



EDMON, P. J.



DHANIDINA, J.